450 P.2d 377

The STATE of Arizona, Appellee,

v.

Michael Patrick SCANLON, Appellant.

No. 1782.

Supreme Court of Arizona.

In Banc.

Feb. 7, 1969.

Rehearing Denied March 4, 1969.

188

Gary K. Nelson, Atty. Gen., Darrell F. Smith, Former Atty. Gen., Norval C. Jesperson, Former Asst. Atty. Gen., for appellee.

Giles & Moore, by Charles M. Giles, Tucson, for appellant.

UDALL, Chief Justice:

Michael Patrick Scanlon was found guilty of attempted rape, and was sentenced to 14 to 15 years in prison. From the verdict and sentence he has appealed.

His wife, Leonore, at the time of her marriage to him, had three children—Victor (15), Rosa (10), and Eva (8). She and defendant became the parents of two more children—Patricia (5), and Kathleen (2).

Rosa testified that one morning her stepfather was drinking, but was "not drinking a lot" and was not "lying like he might have been asleep", and that he tried to have sexual intercourse with her, after her mother left for work. She screamed, bit defendant's hand, and ran from the house. A doctor testified that, upon examination, Rosa's genitals were found to be red, swollen, and bruised. Victor McCullough testified that on the morning in question defendant came into his bowling alley about 10:00 a. m. and asked him to call the Veterans' Hospital, giving as a reason that "I *raped* my 10-year-old daughter"; that defendant said he had "let on that he was sick—and grabbed hold of her"; that defendant then asked him to call Leonore and to listen to the conversation, during which defendant told her the same thing; that defendant did not appear to be intoxicated; that McCullough then called the police. Officer Robb, of the Tucson Police, testified that when he arrived at the bowling alley the first thing he did was to advise defendant of his rights to remain silent and to have an attorney; that the officer read "that little card", carried by him; that after the reading was completed, defendant told him that he "understood these rights"; that he then asked defendant to state what had happened and the defendant thereupon said: "I *tried to rape* my own daughter"; that defendant stated he had taken Rosa in bed and pulled down her pants and tried to rape her and that she ran from the house screaming. The officer then took defendant to jail.

Defendant admits all of these facts but states that his acts with his stepdaughter

took place while he was in a drunken stupor and was unaware of what he was doing. The substance of his testimony was that he has "a statutory award pension for arrested TB"; that he has been a chronic alcoholic for about 20 years; that he has been hospitalized for alcoholism 15 to 20 times for periods ranging from 10 days to nine months; that he went to bed drunk; that he woke up at 2:00 a. m. and drank two fifths of wine and six cans of beer; that he "had DT's six times"; that by 8:30 a. m. he was "shaking to pieces"; that he sent Eva to school with instructions to tell the teacher that Rosa was ill; that he did this, not because of an intention to molest her, but because he needed her to take care of the two youngest children.

He testified that he was "beginning to hallucinate" and went to bed, taking the TV guide with him "for something to focus my eyes on"; that he "went to sleep or passed out" and knew nothing of what happened from that moment until he awakened to the screams of his child and found that his penis was between her legs. He admitted on the stand that the officer "was telling me to be quiet, something he had to advise me of"; that while he was in jail he "went into the DT's" again.

Defendant has filed his own briefs on this appeal and, in addition, has had help from an attorney who has also filed a brief in this court. Both documents are competently written. Together they raise a large number of issues. Some of them we shall not answer, because they are without merit and do not raise issues of sufficient legal interest to justify extending this opinion. Such, for example, is the contention that it was error to permit the State to call defendant's wife to testify against him. The difficulty with that argument is that the State did not call her; she was called by the defendant and testified for him.

Since the defendant admitted the act in open court, there was no issue of fact except whether he knew what he was doing at the time. The jury found against him on this issue, and there was ample evidence to support the verdict. The whole case re-volved about the credibility of the defendant who, though claiming unconsciousness, seems to have been able to recount vividly the amount of liquor he drank, the exact number of "DT's" that he had, etc.

■ The question before us is whether errors of law were made by the trial court. The most important matter argued by defendant is the question of whether his confession to the police officer was "voluntary" in the legal sense of the word. Defendant's argument is that he was in no condition to understand the warnings read to him; that his testimony clearly brought his physical condition to the court's attention; and that it thereby became the court's duty to hold a voluntariness hearing, as required by Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. The principal difficulty with defendant's position is that he made no objection to the admission in evidence of his confession to the arresting officer. It is the rule in this state that, in general, this court will not entertain a claim of error in the admission of evidence to which no objection was made at the trial. State v. Simoneau, 98 Ariz. 2, 401 P.2d 404. The reason for the rule, of course, is that any other rule would encourage a defendant to conceal errors from the trial court. This would mean that he would go free if acquitted, and would get a reversal if convicted. A defendant is not entitled to such a "heads, I win; tails, you lose" arrangement.

It is true that in Jackson v. Denno, supra, the defendant did not make any objection at the trial to the admission of his confession. But he was in custody, he was in pain, he was under heavy sedation administered by the doctor, he was being denied water, and, under all of the circumstances shown by him to have existed at the time he confessed, there was a dispute as to the voluntariness of his confession. In the instant case, however, quite the opposite is true. His arrest was caused by his voluntary request that the police be called. Before he was asked any questions, he was given the necessary warnings. While he testified that he was sick and in

need of medical attention, he did not say that he was drunk, or unable to understand the warnings given to him. The officer gave him no drugs and did not deny him water. *All of these facts come from defendant's own sworn and uncontradicted testimony.*

We have held that the statement of a defendant must be voluntary regardless of whether it is merely an admission or a complete confession. State v. Owen, 96 Ariz. 274, 394 P.2d 206. We have also held that voluntariness must be shown, whether it is brought into question by defendant's formal objection or by the existence of evidence as to defendant's physical condition. State v. Goodyear, 100 Ariz. 244, 413 P.2d 566.

The question of the voluntariness of a confession has a two-fold application: (1) Was the confession coerced by force, threats, or promises, and (2) Was defendant's waiver of his rights to remain silent, to have an attorney, etc. made while his mind was too befogged with alcohol to understand what he was waiving.

As to (1) we have from the defendant's own mouth, while on the witness stand, a clear statement that he made his confession without any coercion.

As to (2) he *now* claims that his physical condition *then* was such that he was not fully aware of his rights or that he was waiving them. A careful review of the transcript fails to show any testimony to support this contention. He did testify that he was too drunk to know what he was trying to do to Rosa, but his discovery of that seems to have sobered him up quickly. He says that he was "horrified". He immediately sent Rosa to school, took the two youngest children to his neighbor for care, and got the neighbor's husband to drive him to the bowling alley. There he told McCullough what he had done, and asked him to listen in on defendant's conversation with his wife. He told his wife what he had done, and said: "You got to get home because I am going to notify the police." He remembered, on the stand,

that the officer was telling him "something he had to advise me of." Defendant had had two years of college. He also told the bartender at the bowling alley what he had done. He testified that he summoned the police because "You can't be admitted" to the Veterans' Hospital, and "If I went there alone they would have called the police and I would have ended up in jail as a drunk."

■ Involuntary confessions are looked upon with disfavor for two completely different reasons: (1) They cannot be relied upon to be true, and (2) The police will not stop using improper methods of coercion unless they are denied the fruits of their misconduct, by refusing to allow the confessions to be admitted in evidence. Neither of these considerations applies in the instant case, if we accept defendant's testimony at face value. The police used no coercion and did an honest job of advising defendant as to his rights. The truth of the confession is not in issue, because defendant reiterated its contents under oath in open court. It would completely stultify the judicial process to exclude defendant's confession on the ground of involuntariness, or to remand it to the trial court for a determination of voluntariness. We hold that the evidence shows, as a matter of law, that it was voluntary. Indeed, the court, in Jackson v. Denno, supra, while stating that "the blood of the accused is not the only hallmark of an unconstitutional inquisition", specifically noted that:

"This is not a case where the facts concerning the circumstances surrounding the confession are undisputed and the task is only to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards. Here there are substantial facts in dispute: Jackson said that he was in pain from his wounds, gasping for breath and unable to talk long. A state witness described Jackson as in strong condition despite his wounds. According to Jackson, the police told him he could have no water and would not be left alone until

he gave the answers the authorities desired. These verbal threats were denied by the State. Whereas Jackson claimed his will was affected by the drugs administered to him, the State's evidence was that the drugs neither had nor could have had any effect upon him at all. Whether Jackson is entitled to relief depends upon how these facts are resolved, for if the State is to be believed we cannot say that Jackson's confession was involuntary, whereas if Jackson's version of the facts is accepted the confession was involuntary and inadmissible."

Thus, Jackson v. Denno, supra, contains in its own language the words which distinguish it from the instant case.

█ Closely connected with the contention that the confession in the instant case required a voluntariness hearing, is the argument that the jury should have been instructed to consider whether the confession was voluntary before proceeding to consider whether it was true. In State v. Pulliam, 87 Ariz. 216, 349 P.2d 781, we held that such an instruction was necessary and that the failure to give it was fundamental error which could be raised for the first time on appeal. But in *Pulliam*, supra, while there was no objection to the instructions, there was a specific objection to the admission of the confession, and there was a hearing on its voluntariness. In the instant case, defendant failed to object to the admission of the confession, failed to request an instruction, and failed to object to the instructions given. The situation, therefore, is in no way comparable to *Pulliam*, supra. Since, in the instant case, we hold that the voluntariness of the confession is clear as a matter of law, from the defendant's own uncontradicted testimony, it would be contradictory and ridiculous for us also to hold that the jury should have been instructed to determine whether it was voluntary, before considering whether it was true.

Appellant next contends that the court erred in instructing the jury:

"If, in other words, after hearing all of the evidence in the case, you feel it is evenly balanced for both sides, it is your duty to find the defendant not guilty."

█ The above instruction is clearly erroneous. It implies that if the scales are tipped—even slightly—against defendant, the jury should find him guilty. That, of course, is an erroneous statement of the law, because proof of guilt must be beyond a reasonable doubt. There are, however, two reasons why the error does not require a reversal: (1) The instructions, read as a whole, clearly tell the jury that guilt must be established beyond a reasonable doubt, and (2) The instruction complained of was given at the request of the defendant, and appears in the record as "Defendant's Requested Instruction # 6."

Defendant also argues that the sentence (14–15 years in prison) exceeds the lawful term that can be imposed under the facts of the case and the applicable statutes. His argument is as follows:

Defendant was charged with attempted rape, without specifying the degree. A.R.S. 13–611 defines first degree rape as sexual intercourse by force, threats, etc. and defines second degree rape as sexual intercourse with a female under 18 years of age. Though the proof in the instant case would support a conviction of first degree rape, the prosecution's theory of the case was confined to second degree rape and so was the court's instructions. Therefore, argues defendant, when the verdict did not specify the degree, his guilt must be confined to second degree rape. The punishment for second degree rape is set by A.R.S. 13–614 at one year to life, in the state prison, or up to one year in the county jail. The punishment for attempted rape is specified by A.R.S. 13–110, subsec. 1 as follows:

(1) "If the offense so attempted is punishable by imprisonment in the state prison for five years or more or by imprisonment in the county jail," the punishment shall be by

imprisonment "for a term not exceeding one half the longest term of imprisonment prescribed upon conviction of the offense so attempted."

(2) "If the offense so attempted is punishable by imprisonment in the state prison for any term less than five years" punishment shall be imprisonment "in the county jail for not more than six months."

Defendant argues that 13–110 means that as to offenses where the *minimum* sentence is over five years, punishment for an attempt to commit such an offense is one-half the maximum sentence; but where the *minimum* sentence is less than five years, the punishment for the attempt is limited to six months in the county jail. Therefore, defendant concludes, punishment for attempted second degree rape cannot exceed six months.

■■ This argument, though ingenious, is fallacious. We need not decide whether the verdict of guilty of attempted rape, without specifying the degree, should be related to first or second degree rape. We may concede, for the purpose of analysing this argument, that defendant is correct and that his conviction can be considered only as a finding that he was guilty of attempted second degree rape. However, we cannot agree with his construction of subsections 1 and 2 of A.R.S. 13–110, supra. In our opinion this statute refers to *maximum* sentences. It means that if the *maximum* sentence that can be pronounced for a crime is less than five years, the sentence for an attempt is limited to six months; but if the crime may be punished by a sentence in excess of five years, the attempt may be punished by a sentence of one-half of the maximum sentence prescribed for the commission of the crime. Since, therefore, the maximum sentence for second degree rape is one year to life, and since life is a sentence in excess of five years, subsection (1) supra applies.

But, argues defendant, one-half of "life imprisonment" is an absurdity—an impossibility. This argument overlooks our decision in State v. Denton, 101 Ariz. 455, 420 P.2d 930, where we said that the trial court can "take as the prescribed maximum, such period of years as it deems proper as a base maximum, and impose a sentence for the attempt at not to exceed one-half such base maximum."

■ Finally, defendant argues that the court gave as an explanation for the long sentence imposed, eight reasons "from the pre-sentencing report." Defendant states that he was not permitted to see the report, and it is not a part of the record before us. We, therefore, have no way of knowing whether defendant's statements regarding it are true. As we explained in State v. Nelson, 104 Ariz. 52, 448 P.2d 402 (December 13, 1968), the question of whether or not a defendant should be allowed to examine the pre-sentencing report is one which depends upon the discretion of the trial judge. As we said in that case:

"If the names of these witnesses are revealed, people would be reluctant to give information; however, if the information is such that the court, in its discretion, feels that defendant should have the right to rebut or explain it the information should be revealed. * * * defendant does not claim that the statements of the witnesses to the probation officer were not correct. He also complains about innuendoes made by the probation officer. The court is able to judge the weight which should be given to a probation officer's report."

The function of the presentencing report is to provide *facts* on which the trial judge can base an intelligent decision as to the proper sentence to be imposed. It is desirable that the report be free from bias, sarcasm, and innuendos and that it—in today's vernacular—tell it like it is.

In the instant case, the report does not entirely measure up to the desired perfection, but, as in *Nelson*, supra, the weight to be given the contents of the report was a matter for the trial judge to determine and we need not assume that the judge was ad-

versely influenced by any improper statements in the report.

There was ample evidence before the court, to support the verdict of the jury and the sentence of the court.

Judgment affirmed.

LOCKWOOD, V. C. J., STRUCKMEYER and McFARLAND, JJ., and HENRY S. STEVENS, Judge, concur.